**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Catherine Hill, individually, as heir of Dillon M. Hill, and as special administrator of the Estate of Dillon M. Hill,<br><br>    Plaintiff<br><br>v.<br><br>Las Vegas Metropolitan Police Department,<br><br>    Defendant | 2:14-cv-01175-JAD-CWH<br><br>**Order Granting Motion for Summary Judgment, Entering Judgment, and Closing Case**<br><br>[ECF No. 62] |

    Catherine Hill sues individually and as the heir and special administrator of the estate of her son Dillon M. Hill, who died shortly after he attempted suicide while awaiting trial at the Clark County Detention Center (CCDC).[1] Hill sues the CCDC's operator the Las Vegas Metropolitan Police Department (Metro) for deliberate indifference to Dillon's safety under 42 U.S.C. § 1983 and for negligence under Nevada state law.[2] Metro moves for summary judgment on both of Hill's claims. Because Hill lacks evidence to show a constitutional deprivation that was caused by a Metro policy or custom, Metro is entitled to summary judgment on Hill's § 1983 claim. And because the record is devoid of evidence to show that Metro breached any duty owed to Dillon, Metro is also entitled to summary judgment on her negligence claim. I therefore grant Metro's motion, enter judgment for Metro and against Hill, and close this tragic case.[3]

---

[1] ECF No. 1.

[2] *Id.*

[3] I find this motion suitable for disposition without oral argument. L.R. 78-1.

**Background**

**A.    The events of March 2013**

On the afternoon of March 23, 2013, Metro officers arrested Dillon (who was on probation) for shoplifting at a Home Depot and transported him to the CCDC.[4] Hill testified at her deposition that she believes Dillon shoplifted to support his heroin addiction.[5] Upon his arrival at the CCDC that afternoon, Dillon passed through a number of booking procedures, including mental and medical-health screenings.[6] His mental-health screening form indicates that he reported being treated for anxiety within the past year, for which he was prescribed Valium,[7] and that he was feeling depressed but he had things to look forward to and had not recently experienced significant loss.[8] He denied that he was currently thinking of hurting or killing himself but reported that he had considered suicide within the last three months and that he had attempted suicide by cutting his wrists nine years earlier.[9] The nurse concluded that there was no need to place Dillon under suicide watch, but she referred him to medical for opiate detox and to mental health for anxiety.[10] In a second mental-health screening, Dillon rated his current depression a 9/10 but indicated that he was not currently considering suicide and that he had never considered suicide.[11] Dillon's medical-health screening form indicates that he admitted to taking methadone, had a history of opiate abuse, and was taking Valium for anxiety; it also indicates that he denied then using illicit drugs.[12]

---

[4] ECF No. 62-1 at 6–10.

[5] *Id.* at 13.

[6] *Id.* at 42–44, 46–50.

[7] ECF No. 72-1 at 11.

[8] *Id.* at 12.

[9] *Id.*

[10] *Id.* at 14.

[11] *Id.* at 21–22.

[12] *Id.* at 18.

As a result of these screenings, Dillon was initially placed in the CCDC's detox unit, where he was observed every 15 minutes and given detox medications.[13] Two days into his detention, Dillon was moved from the detox unit to the general prison population and placed in "3L," an open dormitory-style housing unit.

The next day, Hill visited Dillon at the CCDC via video conference.[14] Hill testified at her deposition that the two had a good visit. She indicated that Dillon stated that he had thought about hurting himself, and that she told him that hurting himself was not the answer to his problems.[15] Hill did not report what Dillon had said about possibly hurting himself to anyone at the CCDC before she left that day.[16]

On March 27th at around 4:00 p.m., Hill called the CCDC and reported to the dispatcher what Dillon had said about possibly hurting himself.[17] The dispatcher called Correctional Officer Spotofora, the officer supervising Dillon's unit, and told her that Hill was concerned about her son possibly hurting himself.[18] Officer Spotofora then called Dillon to her desk to talk to him.[19] In an incident report Officer Spotofora filled out after that conversation, she indicated that she and Dillon "talked abut how he ended up [in CCDC] and [she] asked him what he said to his mom. He said that she must have misunderstood him, [and] that he was not going to hurt himself."[20] The report continues: "[w]e talked about him going back to school. I told him to make a phone call and contact

---

[13] ECF No. 62-1 at 43, 86–89, 91; ECF No. 72-1 at 34.

[14] *Id.* at 102.

[15] *Id.* at 29–30.

[16] *Id.* at 35.

[17] *Id.* at 32.

[18] *Id.* at 114.

[19] ECF No. 72-1 at 66–67.

[20] ECF No. 62-1 at 118.

his mother. After he called, I asked him if he had straightened out the situation. He stated he did."[21] The report reflects that the incident was "resolved by officer."[22] Officer Spotofora also made a notation that she "paged psych."[23] There is no evidence that psych responded, and the relieving officer testified at his deposition that Officer Spotofora reported that she had resolved the incident when psych failed to respond, that Dillon was fine, and that there was no reason for the relieving officer to follow up with psych.[24]

On March 29, 2013, at 2:00 p.m., Dillon filled out a medical-request form indicating that he was "still very sick from withdraws from opiate use and Benzo's."[25] About an hour and a half later, a corrections officer found Dillon hanging from a bed sheet in the 3L shower room.[26] The officer cut him down from the shower head and radioed for help.[27] Several officers and medical staff responded and administered CPR.[28] Dillon was transported to University Medical Center, where he was placed on a ventilator.[29] He died when hospital staff removed the ventilator four days later.[30]

**B.    Metro's SOP for suicidal detainees**

During the relevant time period, Metro had a written Standard Operating Procedure ("SOP") that applied to the CCDC regarding suicide risks. The six-page SOP provides that the "[p]roper reporting and investigative procedures" contained in that document are mandatory, and it directs that

---

[21] *Id.* at 119.

[22] ECF No. 72-1 at 72.

[23] *Id.*

[24] ECF No. 72-1 at 88.

[25] ECF No. 72-1.

[26] *Id.* at 103.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

"[a]ll threats of suicide are to be taken seriously."[31] The policy contains a non-exhaustive list of signs and symptoms of potential suicide and potential high-risk times for suicidal behavior,[32] details how inmates are to be screened for suicide risk during booking,[33] and outlines the procedures to be taken if an inmate is identified as a suicide risk.[34] The section titled "Inmates with elevated suicide risk after initial booking and screening" instructs staff to "be receptive to any information from personnel outside the facility that an inmate is a possible suicide risk," including from family members,[35] and states that "[o]nce an inmate is identified as a possible suicide risk, procedures and steps will be taken to protect [him] from self-harm."[36]

### C.     Metro's summary-judgment motion

Hill asserts two claims against Metro: deliberate indifference to Dillon's serious medical needs and serious risks to his safety under 42 U.S.C. § 1983, and negligence under Nevada state law.[37] Metro moves for summary judgment on both claims, arguing that Hill's § 1983 claim fails because she lacks evidence to show that Dillon suffered a constitutional deprivation and that the deprivation resulted from a Metro policy; Metro argues that Hill's negligence claim fails because she cannot show that Metro breached any duty owed to Dillon and that Metro is also entitled to summary judgment on statutory-immunity grounds.[38] Hill responds that Metro's failure to train its officers to follow the SOP amounts to deliberate indifference to Dillon's constitutional right to receive adequate

---

[31] *Id.* at 90.

[32] *Id.* at 91.

[33] *Id.* at 92.

[34] *Id.* at 92–93.

[35] *Id.* at 94.

[36] *Id.* at 95.

[37] ECF No. 1.

[38] ECF No. 62.

psychiatric care and that whether Metro breached a duty to him is genuinely disputed.[39]

**Discussion**

**A.    Summary-judgment standards**

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[40]  When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[41]  If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed, and the case must then proceed to the trier of fact.[42]

If the moving party satisfies FRCP 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[43]  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; he "must produce specific evidence, through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary basis on which a reasonable fact finder could find in his favor.[44]  The court only considers properly authenticated, admissible evidence in deciding a motion for summary judgment.[45]

---

[39] ECF No. 72 at 12.

[40] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing FED. R. CIV. P. 56(c)).

[41] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[42] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[43] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

[44] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson,* 477 U.S. at 248–49.

[45] FED. R. CIV. P. 56(c); *Orr*, 285 F.3d at 773–74.

**B.      Municipal liability under 42 U.S.C. § 1983**

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."[46] To state a claim under § 1983, a plaintiff must allege that (1) a person acting under color of state law (2) violated a right secured to plaintiff by the Constitution or the laws of the United States.[47]

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Deliberate indifference to a prisoner's serious medical needs or a serious risk to his safety violates the Eighth Amendment's proscription against cruel and unusual punishment.[48] Because Dillon was a pretrial detainee at the time of his death, his claims technically arise under the due-process clause of the Fourteenth Amendment,[49] but courts apply the same standards.[50]

There is no *respondeat superior* liability for § 1983 claims; a municipal entity is only liable if the plaintiff shows that the execution of a municipal policy caused the constitutional injury.[51] "A policy can be one of action or inaction."[52] To impose liability against a municipality for its failure to act, a plaintiff must show that: (1) a municipal employee violated the plaintiff's constitutional rights; (2) the municipality has customs or policies that amount to deliberate indifference; (3) these customs or policies caused the employee's violation of the plaintiff's constitutional rights.[53]

---

[46] *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal citations and quotations omitted).

[47] *West v. Atkins*, 487 U.S. 42, 48–49 (1988).

[48] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

[49] *Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979).

[50] *Clouthier v. Cty of Contra Costa*, 591 F.3d 1232, 1243–44 (9th Cir. 2010).

[51] *Long v. Cty of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

[52] *Id.* (citing *Canton v. Harris*, 489 U.S. 378, 388 (1989)).

[53] *Gibson v. Cty of Washoe*, 290 F.3d 1175, 1193–94 (9th Cir. 2002), *cert denied*, 537 U.S. 1106 (2003).

**C.    Hill lacks evidence to show that a Metro employee violated Dillon's constitutional rights.**

Hill contends that Officer Spotofora was deliberately indifferent to her son's safety because she did not follow the suicide-risk SOP and failed to take the suicide threat seriously.[54] Deliberate indifference has both subjective and objective components. First, a plaintiff must show that an objectively substantial risk of harm existed. Second, a plaintiff must show that the officials "were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that either [1] the official actually drew that inference or [2] that a reasonable official would have been compelled to draw that inference."[55]

The record is devoid of any evidence that Officer Spotofora consciously disregarded a serious risk to Dillon's safety. Dillon was not classified as a suicide risk during booking and was in the general prison population when Officer Spotofora came into contact with him. Once Officer Spotofora received word of Hill's telephonic report, she called Dillon to her station and questioned him about the conversation that he had with his mother.[56] Dillon represented that his mother must have misunderstood him and that he was not going to hurt himself.[57] He also told Officer Spotofora that he liked to ride his skateboard and that he wanted to go back to school and that he was going to live with his grandmother after he got out of jail.[58] Officer Spotofora wrote in the incident report that she had resolved the incident[59] and she testified at her deposition that she did not perceive Dillon as depressed or suicidal based on their conversation.[60] Officer Spotofora also testified that she did not

---

[54] ECF No. 72.

[55] *Tamas v. Dep't. of Soc. & Health Serv.*, 630 F.3d 833, 845 (9th Cir. 2010) (internal citations omitted).

[56] ECF No. 72-1 at 66–67.

[57] ECF No. 62-1 at 118.

[58] ECF No. 72-1.

[59] *Id.* at 72.

[60] ECF No. 62-1 at 122–23.

review Dillon's file, so she was unaware that he had reported during booking a previous suicide attempt.[61] I find that a reasonable jury could not conclude from these facts that Officer Spotofora inferred that a serious risk to Dillon's safety existed or that a reasonable officer would have been compelled to draw that inference under these circumstances.

### D. Even if there were a constitutional violation, Hill lacks evidence to show that Metro has policies amounting to deliberate indifference or that these policies caused the violation.

Hill does not argue or offer evidence to show that Metro's official, written suicide-risk prevention policies were constitutionally deficient. Instead, she argues that Metro had a custom and practice to ignore the department's written policies in favor of an unwritten custom designed solely to shield Metro from liability.[62] She also contends that Metro failed to properly train its employees to follow the SOP and that Metro ratified Officer Spotofora's failure to follow the SOP when it gave her a favorable performance review in August 2013.[63]

Citing only to Officer Spotofora's August 2013 performance review, Hill argues that a jury could conclude that Metro did not expect Officer Spotofora to follow the suicide-risk SOP.[64] In relevant part, the review states:

> [In] [e]arly 2013, an inmate committed suicide in your module . . . . The resulting investigation proved that you did everything according to policy when dealing with this inmate on the days prior to his death. You completed all necessary reports, you contacted Pysch Services, and you briefed your fellow co-workers about the situation. Your actions were very professional and ultimately protected yourself and the department from liability.[65]

I do not find that a reasonable jury could conclude from this review that Metro had a custom to follow an unwritten policy designed solely to shield it from liability rather than follow the SOP itself. The review notes the policy, concludes that Officer Spotofora followed it, and details what

---

[61] *Id.* at 122.

[62] ECF No. 72 at 13.

[63] *Id.* at 14–16.

[64] *Id.* at 13–17.

[65] ECF No. 72-1.

steps she did to do so. Quite simply, nothing in this review suggests that Metro expected the officer to disregard its written policies.

This report also does not support Hill's ratification argument because it is authored by a sergeant and lieutenant, and she has not shown that these individuals had final decision-making authority on Metro's policies. A decision on a single occasion may be enough to establish an unconstitutional municipal policy if an official with final policy-making authority orders or sanctions the action.[66] Whether a government official rises to the level of a final policy-maker is governed by state law.[67] Nevada law designates the Sheriff of Clark County as the final policy-making authority for Metro.[68] There is no evidence that the Sheriff delegated that authority to these reviewing officers. Because there is no evidence that the sergeant and lieutenant who authored Officer Spotofora's performance review had final policy-making authority, this report does not constitute ratification of Officer Spotofora's actions.

Hill also lacks evidence to support her failure-to-train theory. A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability if the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact.[69] The plaintiff must show that the training program is inadequate and that the inadequate training "can justifiably be said to represent municipal policy."[70] A defendant's failure to adequately train its employees to implement a facially valid policy can amount to deliberate indifference.[71] The United States Supreme Court has cautioned that failure-to-train liability is

---

[66] *See Pembuar v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986).

[67] *City of St. Louis v. Prapotnik*, 485 U.S. 112, 124 (1988).

[68] *See* NEV. REV. STAT. § 280.307.

[69] *City of Canton Ohio v. Harris*, 489 U.S. 378, 388 (1989).

[70] *Long*, 442 F.3d at 1187 (citing *City of Canton*, 489 U.S. at 390).

[71] *Berry v. Baca*, 379 F.3d 764, 768 (9th Cir. 2004).

available only in "limited circumstances,"[72] and that a pattern of similar violations is "ordinarily necessary" to show deliberate indifference for purposes of failure to train.[73]

Hill offers no evidence to show that Metro failed to train its employees to follow the SOP. For example, Hill does not cite to any deposition testimony describing Metro's training programs or any training manuals or identify how Metro's training programs were deficient. In fact, Hill actually argues that Officer Spotofora's relieving officer would have followed the SOP by paging psych services "[b]ut for Spotofora's express instructions not to,"[74] which undermines her argument that Metro failed to adequately train its employees to follow the SOP. A reasonable jury could not conclude from these facts that Metro had inadequate SOP-training policies.

Because Hill lacks evidence to show that Dillon suffered a constitutional violation or that a Metro policy caused that violation, Metro is entitled to summary judgment on Hill's § 1983 claim.

**E.     Negligence**

To prove a claim for negligence under Nevada law, a plaintiff must show that: (1) the defendant had a duty to exercise due care towards plaintiff; (2) the defendant breached that duty; (3) the breach was the actual and proximate cause of plaintiff's injury; and (4) damages.[75]

Metro argues that Hill has failed to show that any Metro officer breached any duty owed to Dillon and that Metro is entitled to summary judgment based on discretionary-function immunity. Hill responds that Metro had a constitutionally-imposed duty to provide Dillon with adequate psychiatric care once it was informed that he was a suicide risk, and that Metro breached that duty by its deliberate indifference.[76] In response to Metro's discretionary-function immunity argument, Hill states that Metro "cannot have it both ways" by simultaneously arguing that Officer Spotofora did everything according to Metro policy and that discretionary-function immunity applies to her

---

[72] *Connick v. Thompson*, 563 U.S. 51, 74 (2011) (citing *Canton*, 489 U.S. at 387).

[73] *Id.* at 62 (citing *Board of Cty Com'rs of Bryan Cty, Okl. v. Brown*, 520 U.S. 397, 409 (1997)).

[74] ECF No. 72 at 14.

[75] *See Perez v. Las Vegas Med. Center*, 805 P.2d 589, 590–91 (Nev. 1992).

[76] *Id.* at 18.

decisions.[77]

Because I find that Hill lacks evidence to show that Metro was deliberately indifferent to a serious risk to Dillon's serious medical needs or a serious risk to his safety, Hill cannot show that Metro breached a constitutionally-imposed duty to Dillon. Hill does not identify any other duty breached by Metro and on which she bases her negligence claim. The Nevada Supreme Court has not specifically addressed a prison official's duty to shield an inmate from self harm. In *Butler ex rel. Billver v. Bayer*, the Nevada Supreme Court considered a prison's duty to protect an inmate from an intentional attack by another inmate. The *Butler* court held that the state only has a duty to protect inmates from foreseeable harm,[78] and prison officials have a specific duty to protect an inmate from an intentional attack by another inmate only when the officials actually know of or have reason to anticipate a specific impending attack.[79] Assuming the Nevada Supreme Court would extend this rule to self-inflicted injuries, *Butler* suggests that Nevada law would impose on prison officials a duty to protect an inmate from intentional, self-inflicted harm only when the officials know or have reason to anticipate the specific event.

Dillon never informed anyone at the the CCDC that he was considering suicide. He reported situational depression during booking and indicated that he had attempted suicide nine years earlier, but he repeatedly and consistently denied to CCDC staff having any current suicidal thoughts.[80] The CCDC's independent-contractor medical provider did not classify Dillon as a suicide risk during booking. The only indication that a CCDC employee had that Dillon may be a suicide risk was Hill's phone call two days before his death, in which she indicated Dillon had said he was considering hurting himself.[81] Immediately after Hill's phone call, Officer Spotofora talked to the Dillon, who told her that his mother had misunderstood him and that he was not considering hurting

---

[77] *Id.* at 19.

[78] *Butler ex rel Biller v. Bayer*, 168 P.2d 1055, 1063 (Nev. 2007).

[79] *Id.* at 1064.

[80] ECF No. 72-1 at 12, 21–22.

[81] *Id.* at 60.

himself, and the two discussed his plans for the future.[82] There is no evidence that Dillon exhibited any unusual behavior over the course of the next two days before his suicide attempt. Officer Spotofora's relieving officer testified at his deposition that Dillon's behavior on the evening of March 27th was normal,[83] and even Hill testified that the rest of her conversations with her son were normal and that he did not make any reference to hurting himself to her except during her March 26th visit.[84]

Given these facts, I do not find that a reasonable jury could conclude that Metro owed a duty to prevent Dillon from taking his life because Metro officers did not have reason to anticipate his March 29th suicide attempt. And even if I were to conclude that Metro owed Dillon such a duty, there are no facts to sugest that Officer Spotofora or Metro breached that duty by their response to Hill's phone call or any of their other actions in this case. Accordingly, Metro is entitled to summary judgment on Hill's negligence claim for these reasons, and I do not—and need not reach—Metro's immunity arguments.

**Conclusion**

Accordingly, with good cause appearing and no reason to delay, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that **Metro's motion for summary judgment [ECF No. 62] is GRANTED.**

The Clerk of Court is directed to enter judgment for Metro and against Hill and CLOSE THIS CASE.

Dated this 21st day of June, 2016.

_____
Jennifer A. Dorsey
United States District Judge

---

[82] *Id.* at 68.

[83] *Id.* at 135–37.

[84] ECF No. 62-1 at 34–45.